5 So.2d 472

**J. R. WATKINS CO. v. GOGGANS et al.**

**7 Div. 667.**

Supreme Court of Alabama.

Oct. 30, 1941.

Rehearing Denied Jan. 22, 1942.

C. A. Wolfes, of Fort Payne, for appellee Rowell.

Taylor & Jeffery, of Birmingham, for appellant.

224

LIVINGSTON, Justice.

The J. R. Watkins Company brought this action in assumpsit against William I. Goggans, as principal, and T. A. Goggans and J. T. Rowell, as guarantors for their principal William I. Goggans. By amendment, William I. Goggans was stricken as a defendant, and the cause proceeded to trial against the other two defendants.

The basis of the action is the written contract of unconditional guaranty to the plaintiff of the payment of a debt contracted by William I. Goggans. There was a verdict and judgment in favor of the two remaining defendants.

The cause was tried with a jury on pleas of the general issue and special pleas 4, 5, 6, 7, 8, 9, 10 and 11 of the defendant J. T. Rowell, and special pleas 4, 5, 6, 7, 8, 9 and 10 of the defendant T. A. Goggans. The court gave the general charge for the plaintiff as to pleas 9, 10 and 11 of defendant Rowell, and pleas 9 and 10 of the defendant Goggans. Pleas 4, 5, 6, 7 and 8 of both defendants are, in effect, the same and present the principal question here involved. The pleas allege, in substance, that the plaintiff is a foreign corporation who is not qualified to do business in this State, and that the transaction here involved constituted the doing of business in this State within the purview of the Constitution and statutes of Alabama, and is null and void. Section 232, Constitution of Alabama; Acts 1935, page 256, section 311; Code 1940, Title 51, section 342, Title 10, section 192 et seq.

 Demurrers were interposed to the pleas here involved. The only ruling on the demurrers is as follows: "Demurrers to pleas overruled, plaintiff excepts." Under the uniform decisions of this Court this memorandum will not constitute a judgment sufficient for review here. Ferrell v. City of Opelika, 144 Ala. 135, 39 So. 249;

McDonald v. Alabama Midland Ry. Co., 123 Ala. 227, 26 So. 165; Southern Express Co. v. Ashford, 126 Ala. 591, 28 So. 732; Wilbanks v. Mitchell et al., 239 Ala. 167, 194 So. 513; Skidmore v. H. C. Whitmer Co., 221 Ala. 561, 130 So. 194. Plaintiff's assignments of error, 1 to 7 inclusive, are answered by the foregoing.

Plaintiff's assignment of error number 8 is based upon the ruling of the trial court in permitting William I. Goggans to testify for the defendants as to the description of the territory that was assigned to him by the plaintiff, after it had been determined that the assignment was in writing.

 Where the writing containing or constituting the primary evidence of the fact to be proved is satisfactorily shown to have been lost or destroyed without the fault of the party desiring to prove the fact, secondary evidence is admissible. 22 Corpus Juris 1024; Williams v. Lyon, 181 Ala. 531, 61 So. 299; Lacey v. Southern Mineral Land Co., 180 Ala. 57, 60 So. 283. The inquiry as to the loss of and search for the original document to render secondary evidence admissible, is a preliminary question addressed to the trial court whose determination will generally not be disturbed by an appellate court, unless based upon an error of law, or upon evidence which, as a matter of law, is insufficient to sustain it. Agee v. Messer-Moore Ins. & R. E. Co., 165 Ala. 291, 51 So. 829. We need not review in detail the evidence concerning the loss and search for the document, but on consideration thereof, we are persuaded that the preliminary proof in regard thereto was sufficient to admit secondary evidence. Pollak v. Winter, 197 Ala. 173, 72 So. 386; Laster v. Blackwell, 128 Ala. 143, 147, 30 So. 663.

 Assignments of error 16, 17 and 18 are predicated upon the following exception to the court's oral charge: "With reference to the oral charge, I want to take an exception to the court's charging the jury with reference to doing business in this State, for record purposes only." The specific language of the charge, made the basis of the exception, is not stated,—the exception only designating the subject treated by the court in its oral charge. The appellant can take nothing by its assignments of error based on such an exception. Sullivan v. Miller, 224 Ala. 395, 140 So. 606; Birmingham Ry. L. & P. Co.

v. Friedman, 187 Ala. 562, 570, 65 So. 939; Ex parte Cowart, 201 Ala. 55, 77 So. 349; Doullut & Williams v. Hoffman, 204 Ala. 33, 86 So. 73; Beech v. State, 205 Ala. 342, 87 So. 573; Whittle v. State, 205 Ala. 639, 89 So. 43; Marbury Lumber Co. v. Lamont, 169 Ala. 33, 53 So. 773; Western Union Tel. Co. v. Burns, 164 Ala. 252, 51 So. 373; Knowles v. Blue, 209 Ala. 27, 95 So. 481; H. J. Crenshaw & Co. v. Seaboard Air Line R. Co., 219 Ala. 206, 121 So. 736.

As before stated, the principal question in this cause is whether or not the plaintiff was doing business in this State within the meaning of section 232 of the Constitution of Alabama and Acts of 1935, page 256, section 311; Code of 1940, Title 51, section 342; Title 10, section 192 et seq. Admittedly, the plaintiff is a corporation organized under the laws of the State of Delaware, with its principal place of business at Winona, Minnesota. It is engaged in the business of selling medical preparations, toilet articles, soap products, food products, stock and poultry preparations, extracts, flavors and other articles. It was not qualified to do business in Alabama during the period covered by the transactions involved in this suit.

Plaintiff insists that it was engaged solely in interstate commerce. That its business embraced sales by way of orders sent to its place of business outside this State, where they are accepted or rejected, and if accepted the orders are filled and the goods shipped into Alabama. That the evidence does not show such a doing of business as to require a compliance with our laws relative to foreign corporations. That the contract, which is the foundation of this suit, is a Minnesota contract. Although signed by the defendants in Alabama, it had no binding force or effect until accepted and signed by the plaintiff in Minnesota.

On the other hand, W. I. Goggans, who signed the contract as principal, testified: "Mr. Camp came out on Sand Mountain with Mr. Collins and he filled out my application for the job * * *, that was an application for the contract I later signed. Mr. Camp, the field representative, I think is what they called him, but I don't know, anyway he was the manager, he was the man on the job and everything like that. He met me and Collins at Fort Payne and we talked over the business a right smart. We had the bond and everything and he asked me who was going to sign the bond and I told him my father and Tom Rowell, and he said, 'we will go get them,' and he carried me out to sign the bond. * * * I turned the bond over to him and left it with him. * * * I got the merchandise from Garfield Bearden. He was selling Watkins products in the same territory that I had. He did not continue to sell, he turned the same territory over to me. I got around $300.00 worth of products from Bearden. Mr. Bearden and Mr. Camp and Mr. Collins were present when the merchandise was turned over to me. * * * Bearden had been working in the same capacity that I was working in, in a territory, and that same territory Bearden was in was given to me. * * * I had an agreement with Mr. Camp about the delivery of the Bearden merchandise. He said 'If you intend to take it over, that is perfectly all right,' and I took the merchandise over. * * * I told Mr. Camp that Bearden had asked me to take over his merchandise and I asked him would it be all right, and he said, 'yes, that's all right, we do that kind of business. Of course we had rather sell you new stuff but it will be all right, we will fix it up. We will fill you out a slip of paper and state every item whether it is a half dozen or three or a dozen of how many.' * * * I got it that way and the company charged me $306.01 for it, that's part of the account. I was assigned a certain territory. * * Mr. Camp just told me that I would have the territory from the Tennessee River. He said 'your territory will be in Jackson County from the line down to Guntersville, in Marshall County, and up highway 241 to Boaz and from Boaz cut across to the line,' and that section will be mine. He said Bearden had divided it up down there and asked me would it suit me and I told him I thought it would be all right, so I went ahead and it was not long til they set me back three or four miles on the south side and let some other man have it. They changed the territory later. They assigned J. D. Sargent to that territory on the other side of the highway. I don't know who assigned him, I think Mr. Collins let him have that territory, I will not be sure. The Mr. Sargent that had that territory is not here now. It taken from four hundred to six hundred customers off my territory, the best territory I had on the south side, I did not agree for them to take that territory off. * * * When the contract was entered into and signed by me, father and Mr. Rowell, Mr. Camp and Mr. Col-

lins, the other dealer in Watkins products, stated in their presence what my territory would be. * * * On one occasion he (Camp) came up and he had all agents to meet him down in Gadsden and we talked it over at that time about this territory. They had written me and asked me to move back three or four miles in this territory and I told him that I figured that the best territory I had and I took it up with him and he said, 'We will just let this south side stand like it was, make the highway the dividing line.' Mr. Camp had all the dealers around in this territory come to Gadsden, he just had a meeting and discussed the territory and things like that. I saw him and took this up for one thing about the territory. I told him to let it be like that, that it was a good territory and the best I had and had rather it stand like it was and he said he would do that * * * that he was going to take it up with the company and let it stand like it was, you know, and I did not hear any more about the territory then til a man came out there and Mr. Camp came with him and he told me that I would have to move back and told me where to move to. That man was J. B. or J. D. Sargent. Mr. Camp came with him at that time: he said, 'You will have to move back here to this line' about four miles I guess off on the south side of my territory. I said how come, I thought you said the highway was the line, and he said, 'you will have to move back, this man hasn't got enough territory,' and I said I have a lot out there and I wouldn't like to lose out. He said, 'you will have to do the best you can, this man requires that territory, they fixed it up that way and nothing I can do about it. I said, I have a lot out— I mean that I had a lot out on credit, they insisted on me putting it out on credit."

A letter from J. R. Watkins Company under date of January 14, 1937, directed to Mr. William I. Goggans stated: "We just received your signed agreement from Supervisor Camp, and are sending it on to the home office at Winona, Minnesota, for final approval."

With reference to the transfer of the merchandise from Bearden to William I. Goggans, Mr. Bearden testified: "The best I remember, Mr. Camp said it would be all right for me to transfer the goods I had to W. I. Goggans. * * * After I transferred the goods to Goggans I got credit for them from the Watkins Company."

Defendant introduced the following letter in evidence:

"The J. R. Watkins Company,
"Memphis, Tenn.
"Oct. 21, 1937.
"Mr. W. I. Goggans,
"Alabama.
"Dear Mr. Goggans:
"I have just finished writing T. H. Collins about coming over into your locality and selling at cut prices.
"I hope this letter will have some effect. Mr. Collins really has as much locality as he needs without getting in anybody else locality. In fact, I have written Collins asking him to divide his locality in order that we put two men there.
"I believe if a man has a little smaller locality and cover it more closely, he'll get more business out of it and give his customers better service.
"Cordially yours,
"J. W. Gowdy,
"District Sales Manager."
JMH:P.

J. P. Sargent testified that in the early part of 1938, Mr. Hope, representing the plaintiff as a collector, "told me that if Goggans wanted to check in and make a settlement and if I wanted to buy the goods, he could save Goggans a discount on the account."

■■ When a foreign corporation does business within the State, of necessity the business is done by and through agents, and the necessity is recognized by the Constitution and statutes. It is not within the purview of either, that the corporate organization or its head or principal officer will migrate into the State. It is contemplated that in this State the corporation may have a visible existence by the presence of agents authorized to act for it, exercising such powers as may be intrusted to them. Making such contracts and transacting such business as may fall within the scope of the authority conferred. The mere presence of an agent within the State, authorized to transact particular business, not involving an exercise of the corporate powers or franchise, not a part of the business of the corporation was created and organized to transact, is not within the proper meaning of the phrases "do business," "does business," or "doing business" as employed in the Constitution and statutes. In the case of Beard v. Union & A. Publishing Co., 71 Ala. 60, the Court said:

"There must be a doing of some of the works, or an exercise of some of the functions, for which the corporation was created, to bring the case within that clause" referring to the first clause of the fourth section. Const. 1875, art. 14. And in Christian v. American Freehold Land & Mortgage Co., 89 Ala. 198, 7 So. 427, it was held that the prosecution or defense of an action in the courts of the State is not the doing of business within the meaning of the Constitution. Nor is the mere collection of, or attempt to collect a debt within such meaning.

The real test is that applied in Beard v. Union & A. Publishing Co., supra. Is the corporation engaged in the transaction of business, or any part thereof, it was created and organized to transact? If it be, it "does business" within the meaning of the Constitution and statutes. If it be not, if the act it is doing, or has done, is not within the general powers and franchises, it is not the business to which the constitutional and statutory requirements are directed.

The appellant was engaged in the business of manufacturing and selling goods, wares and merchandise. If the business carried on in this State consisted wholly in the sale and delivery of goods to be brought into the State upon orders taken either in or out of the State our Constitution and statutes have no application. If, on the other hand, the business carried on in this State included something more than such interstate commerce, the Constitution and statutes do apply.

Where the evidence is in conflict, the question is one of fact to be determined by the jury. Otherwise, it is a question for the court. In the instant case, the inferences to be drawn from the evidence are not, as matter of law, so obvious as to justify the taking of the question from the jury. Assignments of error 9 to 15, inclusive, are based on the refusal of the trial court to give the general charge for the appellant. There is no merit in these assignments.

Assignment of error 19 is predicated on the overruling of appellant's motion for a new trial. We find no error in the ruling.

No error appearing in the record for a reversal, the cause is due to be affirmed.

Affirmed.

GARDNER, C. J., and BOULDIN and FOSTER, JJ., concur.