Sune LYXELL and Operation
Sweden, Plaintiffs,

v.

John B. VAUTRIN, Crockett White,
Elbert White and Christ for the
World Foundation, Defendants.

Civ. A. No. 78–299–H.

United States District Court,
S. D. Alabama, S. D.

Jan. 16, 1979.

Robert M. Galloway, Mobile, Ala., for plaintiffs.

Willis C. Darby, Jr., and J. Richard Carrigan, Mobile, Ala., for defendants.

HAND, District Judge.

The plaintiffs initiated this lawsuit through the filing of a complaint invoking this Court's diversity jurisdiction and claiming damages from the defendants on both tort and contract grounds.

Plaintiff Lyxell is a resident citizen of Sweden, and plaintiff Operation Sweden is a Swedish organization devoted to the Christian ministry, having as its president plaintiff Lyxell. Defendants Vautrin, Crockett White, and Elbert White are resident citizens of Baldwin County, Alabama. Defendant Christ for the World Foundation is a non-profit religious corporation with its principal place of business in Baldwin County, Alabama.

The complaint, as amended, sets out five causes of action upon which the plaintiffs assert that they are entitled to a recovery from these defendants. In the first count, the plaintiffs allege that in reliance upon misrepresentations made by defendants Vautrin and Crockett White, plaintiff Lyxell gave these defendants the sum of $77,-500.00, and that such sum was therefore obtained from plaintiff Lyxell by means of fraud. The second count repeats these allegations of fact, and further avers that the alleged misrepresentations were made recklessly by these defendants without knowledge of the true facts. In the third cause of action the same factual allegations are made, with the further allegation that "[t]he representations made by the defendants were false and they were made by mistake with the intention that plaintiffs should rely upon them." The fourth count sounds in conversion, with the plaintiffs alleging that the defendants have converted the money in question to their own use "in that they have taken control of the plaintiffs' property and refused to return it, after demand has been made." In the final cause of action the plaintiffs assert a breach of contract stemming from the alleged failure of the defendants to comply with an agreement entered into between the parties.

The matter came on for consideration by the Court of the motions for summary judgment filed by each of the defendants and the Court, having considered the record, the affidavits in support of the motions, the deposition on file, and the memoranda of law and arguments propounded by counsel

for all parties, together with the applicable law, finds as follows:

### FINDINGS OF FACT

1. Defendant John B. Vautrin was, from 1970 until June of 1977, pastor of the Evans United Methodist Church in Rockford, Illinois. In May of 1977 plaintiff Sune Lyxell introduced himself to Vautrin after church services and told Vautrin that he, Lyxell, was in the United States on behalf of a group known as Operation Sweden. Vautrin allowed Lyxell to speak at church services the following week and Lyxell later appeared with Vautrin on Vautrin's three hour religious radio program in Rockford. During this period in Rockford, Lyxell and Vautrin discussed the possibility of establishing a Christian radio station.

2. On June 8, 1977 Vautrin retired from his position with the Rockford church and moved to Orange Beach, Alabama. Lyxell subsequently wrote to Vautrin and informed him that he, Lyxell, would like to give money to be used to establish a Christian radio station in Baldwin County, Alabama. Vautrin responded with a phone call inviting Lyxell to visit him in Orange Beach.

3. Lyxell accepted the invitation in July of 1977 and he drove to Orange Beach with his family. He spoke with Vautrin on numerous occasions concerning the establishment of "Christ for the World Foundation" (CWF) and the subsequent establishment by that foundation of a Christian radio station in Baldwin County. During this period of time Lyxell and Vautrin signed a note with the State Bank of the Gulf in Gulf Shores, Alabama by which they borrowed $2,000.00 on behalf of the Christ for the World Foundation, and this sum was deposited in a checking account in the Foundation's name at the State Bank of the Gulf. Although many documents were drafted between Vautrin and Lyxell during this period concerning creation of the Foundation, all of the documents were destroyed.

4. On July 22, 1977, Lyxell delivered a certificate of deposit worth $25,104.36 to the State Bank of the Gulf for the account of CWF, and on the same date Lyxell received $500.00 in cash from the proceeds of a check drawn to cash by Vautrin on the account of CWF. Later that day Lyxell made his initial request to defendant Crockett White that he participate in the CWF efforts initiated by Lyxell and Vautrin.

5. The following day, July 23, 1977, at Crockett White's house, a protocol was entered into bearing the signatures of Sune Lyxell, his wife Mona Lyxell, and defendants Vautrin and Crockett White (Exhibit A to Motion for Summary Judgment). Under the protocol, the signatories agreed to begin a Christian, non-profit ministry to be known as Christ for the World Foundation, that the purpose of this ministry would be to work for a righteous, Christian world, based on the Ten Commandments, and that this purpose would first be manifested through the creation of a Christian radio station in Baldwin County, Alabama to be known, if the FCC approved, as the Christ for the World Radio and adopting the call letters WCFW.

Under the protocol, it was further agreed that Lyxell would be President of CWF, that Vautrin would be Vice-President and manager and program director of the radio ministry, that Crockett White would be Vice-President in charge of the financial affairs of CWF, and that another party to be named in the future was to serve as Vice-President in charge of overseeing CWF's Christian purposes.

It was further agreed that Vautrin was to begin fulltime work for WCFW at a salary of $800.00 per month and that he would receive $.08 per mile for automobile expenses. His duties were to include traveling to different churches and organizations preaching the message of CWF and seeking donations for the ministry of CWF, with all gifts so received to be deposited in the CWF account.

With respect to WCFW, it was agreed that the CWF would purchase suitable facilities and equipment for the station and that Vautrin would apply to the FCC for a radio license and to the IRS for a tax

exemption on behalf of CWF. The parties also agreed that CWF would start a magazine, and that Lyxell would serve as the chief editor.

Finally, the parties to the protocol agreed that 80% of the surplus money in the hands of the CWF would be used "for the ministry of a Righteous Christian Sweden and for helping the persecuted Christians in communistic countries and said 80% must be submitted through Operation Sverige (Sweden) . . ."

6. On the day after the protocol was signed by the parties, Lyxell and his family left Orange Beach.

7. Two days later, July 26, 1977, Vautrin flew to Washington, D. C., to meet with attorneys from a firm specializing in FCC matters (hereinafter denoted FCC counsel). He also spoke with a consulting engineer, who informed him that the only available Orange Beach frequency overlapped with stations in Brewton, Alabama, and Pascagoula, Mississippi. Due to this, FCC counsel informed Vautrin that attempting to obtain that frequency would not be practical since the overlapping would entail a lengthy and costly FCC hearing and since the application would probably eventually be denied. However, FCC counsel then informed Vautrin that an existing radio station in Fairhope, Alabama (WGOK–FM), not far from Orange Beach, was for sale.

8. Vautrin then left Washington and went back to Rockford, Illinois to explain to Lyxell what had transpired in his efforts to establish the radio station. He told Lyxell that the Fairhope station was available, and they discussed the possibility of purchasing it. Vautrin then returned to Orange Beach and Lyxell returned to Sweden. Prior to leaving, Lyxell requested and received $10,000.00 for expenses on his return to Sweden, getting $3,500.00 in cash from Vautrin and $6,500.00 in a cashier's check.

9. On August 17, 1977, Vautrin, Crockett White, and Marion Arnould (who was listed as present on the July protocol but who actually was not present and did not sign the protocol) met with Jules Paglin, President of WGOK, Inc., owner of the available Fairhope station. Also present at this meeting was Willis C. Darby, Jr., attorney for WGOK, Inc. Lyxell was not at the meeting, but rather was back in Rockford, Illinois. After a discussion of the purchase price and other terms, Vautrin, Crockett White, and Arnould agreed on behalf of CWF with Paglin to purchase the station for $175,000.00. The terms of the sale called for a down payment of $75,000.00 and the balance to be paid over a five year period, with $10,000.00 put in escrow as earnest money, contingent upon FCC approval.

10. Vautrin communicated the sale to Lyxell by phone shortly thereafter. In early September of 1977 Vautrin learned from attorney Darby that the FCC was unlikely to approve the sale of a station to a foreign citizen such as Lyxell. There is a dispute of fact concerning whether Lyxell was informed of this prior to the sale, with the defendants contending that Vautrin informed Lyxell of the FCC problem and Lyxell denying it. The dispute is not material. The first draft of the sale contract provided space for signatures by both Sune and Mona Lyxell, Vautrin, Crockett White, and Arnould. This draft was amended by removal of the Lyxell signature lines on September 7, 1977, and Arnould's signature was subsequently removed at his request.

11. On September 16, 1977 Lyxell transferred $62,895.64 to the account of the CWF at the State Bank of the Gulf in Gulf Shores. Lyxell subsequently returned to Sweden.

12. In early November of 1977 the contract for the sale of the radio station was executed between WGOK, Inc. and CWF, with Vautrin and Crockett White signing on behalf of CWF. Vautrin and Crockett White agreed to personally guarantee the note given by the CWF for the unpaid balance of the purchase price, which was $100,000.00. In a letter dated November 11, 1977, Vautrin informed Lyxell that the contract for the purchase of the radio station had been signed.

13. On December 12, 1977, CWF was incorporated as a non-profit religious corporation by Vautrin, Crockett White, and Elbert White. The incorporation was suggested by attorneys in order to facilitate FCC approval of the purchase of the radio station. In January of 1978 CWF assumed the contract to purchase the station that had been executed on its behalf and an application was filed in behalf of CWF for FCC approval of the station sale.

14. In March of 1978 Vautrin was informed by the FCC counsel that the FCC application would be approved within one week of receipt of a statement of non-discriminatory treatment of other religious points of view, together with a financial statement showing adequate financial resources to meet operating expenses for one year. Vautrin was informed by FCC counsel that the additional amount of financial resources necessary was $50,000.00.

15. Later in March of 1978 Lyxell spoke over the telephone to Vautrin and Crockett White concerning the additional money needed for FCC approval, and Lyxell told them that he could bring in $22,500.00. Lyxell returned to Alabama in April of 1978 and met with Vautrin, Crockett White, and Elbert White. He had brought the $22,-500.00 with him, but he did not turn the money over to them because he was dissatisfied that he was no longer president of CWF. Vautrin then told Lyxell that he could be president if he would become an American citizen, which Lyxell indicated that he might do.

16. Lyxell then informed Vautrin that he needed the $77,500.00 back for use in Sweden in the upcoming Swedish elections, and that he, Lyxell, had only one month's operating expenses left for Operation Sweden. Vautrin and Crockett White declined to pay the money back to Lyxell, since by that time $10,000.00 was in escrow as earnest money, legal fees in excess of $3,000.00 had been incurred, and some other money had been spent for other expenses incurred during the purchase of and negotiations to purchase the radio station. At this time Lyxell spoke with Marion Arnould, who had previously participated in CWF affairs and had offered further assistance to CWF. After this conversation, Arnould discontinued his participation in CWF and withdrew his offer of further support for CWF.

17. Following his refusal to turn over the $22,500.00, Lyxell decided to oppose FCC approval of the sale of the station in order to improve his own chances of recovering most of the money he had previously transferred into CWF. On May 19, 1978, Lyxell joined with Operation Sweden in bringing this action against CWF and individual defendants Vautrin, Crockett White, and Elbert White on three counts of fraud and one of conversion. The plaintiffs sought a preliminary injunction to restrain CWF from making any further expenditures, hoping to thereby frustrate approval of the sale. The application for injunction by the Court was denied due to the plaintiff's inability to post bond in a sufficient amount.

18. Subsequent to the denial of the injunctive relief sought CWF negotiated a reduction in the down payment to be made to WGOK, Inc., from $75,000.00 to $50,-000.00, with the remaining $125,000.00 to paid over five years. Vautrin and Crockett White again personally guaranteed payment of the balance. CWF began operating the radio station on July 1, 1978 and, so far as is revealed by the record, continues to operate the station at this time.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this lawsuit and the parties hereto by virtue of the Court's diversity jurisdiction, as set out in Title 28, U.S.C.A., § 1332. Since the matter arises under the Court's diversity jurisdiction and since the preponderance of the events giving rise to the litigation occurred in Alabama, the law of the State of Alabama is controlling with respect to the substantive rights of the parties. *Bank of Lexington v. Jack Adams Aircraft Sales, Inc.,* 570 F.2d 1220 (5th Cir. 1978); *Bendix Home Systems, Inc. v. Hurston Enterprises, Inc.,* 566 F.2d 1039 (5th Cir. 1978).

2. The matter is before the Court on motions for summary judgment by the various defendants. Under Rule 56(c) of the Federal Rules of Civil Procedure, such summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits on file, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See generally Nunez v. Superior Oil Co.*, 572 F.2d 1119 (5th Cir. 1978); *A.M.R. Enterprises, Inc. v. United Postal Savings Ass'n.*, 567 F.2d 1277 (5th Cir. 1978); *Chavez v. Noble Drilling Corp.*, 567 F.2d 287 (5th Cir. 1978); *Munoz v. International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators*, 563 F.2d 205 (5th Cir. 1977). The Court is of the opinion that summary judgment is appropriate in this action, for those factual disputes still existing are not material to the legal questions presented by the complaint in this matter, but rather are either collateral or irrelevant.

3. The first three causes of action set out in the plaintiffs' complaint allege fraud under varying circumstantial allegations. The Court is convinced that neither the allegations of the complaint nor the factual circumstances of this case amount to actionable fraud under Alabama law.

The first contention of plaintiff Lyxell is that he gave $77,500.00 to defendants Vautrin and Crockett White in reliance upon a misrepresentation made by them to him during the organizational period of CWF and WCFW Radio. The second count is virtually identical, with the added allegation that these defendants made the alleged misrepresentation recklessly without true knowledge of the facts. The final fraud claim is an alternative contention asserting that the alleged misrepresentation was made by mistake by the defendants with the intention that the plaintiffs should rely upon them. The only representation in question is the promise by Crockett White and Vautrin that "monies invested by the plaintiffs would be controlled by the plaintiffs in that Sune Lyxell would be the President of Christ for the World Foundation and he and his wife, Mona Lyxell, would be Directors of the corporation." Accordingly, the question for the Court is whether these defendants may be held liable for an alleged misrepresentation stemming from a promise to perform in the future.

■ The Court construes the plaintiffs' complaint as seeking to state an action in deceit under Section 6–5–103 of the Code of Alabama, which provides in pertinent part that "[w]illful misrepresentation of a material fact made to induce another to act, and upon which he does act to his injury, will give a right of action." The test in cases of misrepresentations with respect to future occurrences is set out in *Birmingham Broadcasting Co. v. Bell*, 259 Ala. 656, 68 So.2d 314 (1953): ·

> A mere allegation of a fraudulent intent to deceive is not enough. But there must be "circumstances tending to show an actual fraudulent intent at the time the promise or representation regarding a future event is made". . . . A promise to constitute fraud must be made with intent not to perform it.

> Neither section 108 nor section 110 (now sections 6–5–101 & 103) speak of future occurrences. They both refer to "a material fact," which is then existing. As to promises (or opinions) there must have been at the time an intention not to do the act promised (an existing promise) and that it was made with the intent to deceive. Here there is no allegation . . that there was no intention to do the act specified when the statement was made.

68 So.2d at 321 (citations omitted). *See also Evans v. Adam's Rib, Inc.*, 289 Ala. 377, 267 So.2d 448, 450–51 (1972). There can be no question then that to establish actionable fraud under the facts of this case it is incumbent upon the plaintiffs to prove that at the time that Vautrin and Crockett White made the representation to Lyxell that the representation was false, that the representation was made with intent to deceive, and that the defendants had no intention to perform the promise set out in the representation.

The plaintiffs contend that a material question of fact worthy of jury consideration has been raised with respect to the question of the defendants' intent at the time the representation was made, citing *Bracewell v. Bryant*, 329 So.2d 552 (Ala. Civ.App.1976), where it was stated that " '[i]ntent is a matter peculiarly within the province of the trier of facts.' " 329 So.2d at 554, *quoting Walker v. Woodall*, 288 Ala. 510, 262 So.2d 756 (1972). The Court agrees that matters of intent are generally for the jury, since that body is best qualified to delve into the inner workings of other persons' minds. But here the only evidence of any such intent to deceive is the fact that the promise made by the representation was not performed. There is no question but that mere nonperformance of a promise will not support a fraud claim. *Old Southern Life Insurance Co. v. Woodall*, 295 Ala. 235, 326 So.2d 726 (1976); *Old Southern Life Insurance Co. v. McConnell*, 296 So.2d 183 (Ala.Civ.App.1974). On the other hand, such nonperformance may be considered with other factors in reaching a determination as to whether such intent to deceive existed at the time the representations were made. *Bracewell, supra*, at 554, *citing Brock v. Brock*, 90 Ala. 86, 8 So. 11 (1890). Thus the plaintiff's burden, nonperformance having been admitted, is to put forth other evidence linked to the nonperformance to indicate an intent to deceive. In the instant case the plaintiffs have not set forth any additional evidence to enhance the admitted nonperformance. The defendants put forth evidence with their motion for summary judgment to the effect that they had no intention to deceive the plaintiffs at the time that the promise was made, and blaming their nonperformance on the later discovery that aliens such as Lyxell could not buy an American radio station because of federal law governing the FCC. The defendants having put forth this evidence in support of the motions for summary judgment, it was incumbent upon the plaintiffs, under Rule 56(e) of the Federal Rules of Civil Procedure, to respond to the evidence by setting forth specific facts supporting the proposition that there is a genuine issue for trial. In this particular case the plaintiffs might have responded by affidavit or otherwise and indicated what evidence they expected to put on to rebut the defendants' theory or to enhance the evidence of nonperformance. They did not do so and the Court can only conclude that there is no evidence of any intent to deceive beyond the admitted nonperformance of the promise. On this basis, the Court must find for defendants Crockett White and Vautrin on the fraud claims.

With respect to defendants Elbert White and Christ for the World Foundation, the Court concludes that summary judgment in their favor is similarly appropriate. The plaintiffs admit that no fraud claim is maintained against Elbert White. With respect to CWF, there is no question but that the representation made the basis of the fraud claims preceded the incorporation of CWF, and it cannot be in any way held responsible for a representation made prior to its existence. Accordingly, the Court finds summary judgment appropriate on the fraud claims in favor of all defendants.

4. The next cause of action set out in the plaintiffs' complaint is for conversion, with the plaintiffs contending that each of the defendants have converted the property of the plaintiffs to their own use in that they have taken control of such property and have refused to return it after demand has been made.

There is a statutory cause of action for conversion under Alabama law. Section 6–5–260 of the Alabama Code provides that: "The owner of personalty is entitled to possession thereof. Any unlawful deprivation of or interference with such possession is a tort for which an action lies." On their conversion claims, the plaintiffs contend that plaintiff Lyxell understood that he could have his money returned at any time prior to the actual purchase of the radio station, and that the defendants' refusal to return the money upon the April 1978 demand amounted to conversion.

Under Alabama law "[t]o be entitled to the right of recovery for conversion,

plaintiff must have general or special title to the property in question, and in the possession or immediate right of possession; and the party complained against must have wrongfully exerted some act of dominion over such property inconsistent with and destructive of the title of the party plaintiff." *Hamilton v. Hamilton*, 255 Ala. 284, 51 So.2d 13, 18 (1951). Accordingly, the threshold issue for the Court's consideration is whether the plaintiffs have any general or special title to the property in question.

■ There is little factual dispute with regard to the manner in which the property that was allegedly converted came into the hands of the defendants, although there is some uncertainty with respect to whom the money belonged before it came into the defendants' possession. This uncertainty is not material to the Court's analysis of the situation. Exhibit A to the defendants' brief in support of their motions for summary judgment is a memorandum (the memo is written in Swedish and the Court relies upon the defendants' translation) signed by Lyxell and two others in which it is reported to Foundation Operation Sweden that Lyxell had made a loan of $77,-500.00 to CWF on behalf of Foundation Operation Sweden. If the transfer of money was indeed a loan, then title to the property passed at the time the money was transferred to CWF and the plaintiffs have no right of possession until sometime in the latter part of 1979, since Lyxell has testified that the loan was to be repaid before the fall of 1979 (Deposition of Sune Lyxell, p. 199). Thus the plaintiffs have no general or special title in the personalty, and accordingly cannot now be heard to complain of conversion.[1] *See e. g., Whitman v. Mashburn*, 286 Ala. 209, 238 So.2d 709 (1970); *Jones v. Americar, Inc.*, 283 Ala. 638, 219 So.2d 893 (1969); *State Farm Mutual Automobile Insurance Company v. Wagnon*, 304 So.2d 216 (Ala.Civ.App.1974). Under this state of the facts the Court is convinced that summary judgment in favor of all defendants on the conversion claims is appropriate.

5. The final count in the amended complaint seeks recovery of damages for breach of contract, with the plaintiffs taking the position that "an agreement was entered into whereby Sune Lyxell would be President of Christ for the World Foundation and Sune Lyxell and his wife, Mona Lyxell, would be Directors of Christ for the World Foundation."[2] The plaintiffs allege a further agreement that "eighty percent of the surplus money of Christ for the World Foundation would be turned over to the plaintiffs."

Initially, the Court notes that defendant Elbert White was not a party to the agreement upon which the contract claims are based (Lyxell deposition, pp. 152–53). Accordingly, Elbert White is entitled to summary judgment for having promised nothing he can be held liable for nothing.

---

1. The Court notes for edification of counsel for the defendants that there is a factual dispute with respect to the nature of the transaction in question, since the plaintiffs have denominated the transfer a loan while the defendants contend it was a gift. This dispute is not material to the Court's resolution of the issue, however, since whether the transaction is cast as a loan or a gift the plaintiffs had no general or specific title to the property at the time the suit was filed and have had no such title at any time during the pendency of this lawsuit.

2. The Court notes that prior to the realization that FCC approval could not be obtained with Lyxell, an alien, as an officer, Lyxell served as a principal in Christ for the World Foundation with equal power, along with Vautrin, to draw on the financial resources of the Foundation held in the Bank of the Gulf. It was the FCC situation, not any pre-existing intent on the part of Vautrin or Crockett White, that caused Lyxell not to be made an officer of CWF after its incorporation.

The plaintiffs allege an additional agreement that Sune Lyxell would be the Chief Editor of the magazine which Christ for the World Foundation would start. This purported agreement is not before the Court at this time because the evidence is clear that the condition precedent to invocation of the agreement, i. e., the initiation of the magazine by CWF, has not occurred. Additionally, there may be some question over whose responsibility it was to be to start the magazine initially. This dispute is not relevant at this time however.

The contract claims with respect to Vautrin, Crockett White and CWF are not so easily resolved. There is no question but that the promise made to Lyxell in the July 22, 1977 protocol by Vautrin and Crockett White was not kept, since Lyxell was not made President of CWF, since he and his wife were not made Directors, and since 80% of the surplus money has not been remitted to Operation Sweden as provided under the protocol.

 The defendants argue that since the plaintiffs were investing in an Alabama non-profit religious corporation, plaintiff Operation Sweden was therefore doing business in Alabama within the meaning of the law and thus was required to qualify to do business in Alabama. There is no question but that the failure to so qualify, if required by law, would render the contract void at the suit of the non-qualified corporation. *SAR Mfg. Co. v. Dumas Bros. Mfg. Co.*, 526 F.2d 1283 (5th Cir. 1976); *Calvert Iron Works, Inc. v. Algernon Blair, Inc.*, 284 Ala. 655, 227 So.2d 424 (1969). The primary consideration for the Court then, at least with respect to plaintiff Operation Sweden, is whether it was such an entity as would be required under Alabama law to qualify to do business in the State of Alabama.[3]

 The test for determining whether a foreign business entity[4] is doing business in the State of Alabama within the meaning of the statutes is set out in *Spurlock v. J. T. Knight & Son*, 244 Ala. 364, 13 So.2d 396 (1943), in which the Alabama Supreme Court questioned:

Is the corporation engaged in the transaction of business, or any part thereof, it was created and organized to transact? If it be, it "does business" within the meaning of the Constitution and statutes. If it be not, if the act it is doing, or has done, is not within the general powers and franchise, it is not the business to which the constitutional and statutory requirements are directed.

13 So.2d 396, *citing J. R. Watkins Co. v. Goggans*, 242 Ala. 222, 5 So.2d 472 (1941). The Court thus must determine whether Operation Sweden, in investing $77,500.00 in CWF, was engaged in the transaction of business that it was created and organized to transact. The Court has absolutely no knowledge of the purposes underlying the function of Operation Sweden, but the Court is convinced that the defendants having alleged in their motions for summary judgment that this plaintiff was required to qualify to do business in Alabama, it is incumbent upon this plaintiff, pursuant to Rule 56(e), *supra*, to come forward with some evidence tending to establish that such qualification was not required of the Swedish entity. This plaintiff gave the Court no information on this issue, so the Court is content in finding that Operation Sweden is to be treated as a foreign corporation and as such is not qualified to do business in Alabama, and, therefore, the contract made the basis of this claim is void as to the foreign corporation. Accordingly, summary judgment is due to be entered in favor of the defendants and against this plaintiff on the contract claim.[5]

---

**3.** Indeed, not only is the enforceability of a contract at issue here, but possibly criminal liability, for section 10–2–252 of the Alabama Code makes it a misdemeanor punishable by fine and/or imprisonment for any foreign corporation or person acting as agent, servant, or officer of a foreign corporation to "make or attempt to make any contract, agreement, undertaking or engagement with, by, or in the name of or for the use or benefit of any such corporation without a license authorizing such corporation to do business in this state . ."

**4.** The Court is content to describe Operation Sweden as a business entity rather than a corporation since the plaintiffs contend that it is

not a corporation. Not being versed in Swedish law, the Court has no intimation of the status of Operation Sweden as a business entity or otherwise in its homeland, but from the facts of this case as presented the Court is convinced that the entity is entitled to no greater status than that accorded a foreign corporation.

**5.** The Court notes that there is no statutory proscription against foreign individuals entering into and enforcing contracts made in the State of Alabama, and that Lyxell might therefore have individual contract claims to present. However, the plaintiffs have adamantly contended that the $77,500.00 that CWF received

was a loan from Operation Sweden. Assuming this, and assuming further that the promises made in the July 22, 1977 protocol were return consideration for the loan, then Lyxell's claim on the contract would be that of a third party beneficiary. As such, the Court is reluctant to give him any greater rights than those owned by promisee Operation Sweden.